

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-24-00432-CV

---

IN RE A.D., Relator

---

Original Proceeding
324th District Court of Tarrant County, Texas
Trial Court No. 324-623909-17

---

Before Womack, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

Relator A.D.[1] (Father) seeks mandamus relief from the trial court's order disqualifying his attorneys from representing him in the trial court and ordering his attorneys to pay Real Party in Interest M.R.D.'s attorneys $5,000 in sanctions. M.R.D. (Mother) had moved the trial court to disqualify Father's attorneys after a paralegal had left the law firm representing Mother and started working for the law firm representing Father. Because the trial court abused its discretion by disqualifying Father's attorneys and because Father has no adequate appellate remedy, we conditionally grant a writ of mandamus.

## I. BACKGROUND

Father and Mother have two children together. They were divorced in 2016 and entered into an agreed order modifying their parent–child relationships with both children in 2018. In 2023, Father petitioned the trial court to modify that order. He was—and, as of the filing of this mandamus proceeding, continues to be—represented by the firm of Orsinger, Nelson, Downing & Anderson, LLP (ONDA).

On May 10, 2024, Mother met with Laura Zachariah, an attorney at Seltzer Family Law, PLLC, and retained Seltzer Family Law to represent her in the modification proceeding. Seltzer Family Law filed a Notice of Entry of Appearance

---

[1]To protect the identities of Relator and Real Party in Interest's minor children, we identify Relator and Real Party in Interest by their initials or as Father and Mother. *See* Tex. Fam. Code Ann. § 109.002(d).

in the trial court that same day. In June, Shelby Langford, a paralegal at Seltzer Family Law, accepted an offer of employment from ONDA. On June 19, 2024, Langford tendered her resignation from Seltzer Family Law—effective June 26, 2024—to her then-boss, Sarah Seltzer. Also on June 19, Langford informed Greg Padron, an office administrator at ONDA, that Mother was a client of Seltzer Family Law. Langford told Padron that she "literally d[id no]t know anything about the case," including the name of ONDA's client.

On June 27, 2024, Seltzer Family Law served ONDA with a notice of intention to take Father's deposition on July 23, 2024, at Seltzer Family Law's office. After Father moved to quash the notice, Seltzer Family Law served Father with an amended notice to take Father's oral and videotaped deposition at the same date but at ONDA's office.[2]

On July 11, 2024, Seltzer sent an email to ONDA stating that Langford had "had access to confidential client information" while employed at Seltzer Family Law and asking ONDA if it would "voluntarily withdraw from this matter. If not," Seltzer warned, "a motion for disqualification seeking attorney's fees and sanctions will be forthcoming." Kaleigh Downing, one of the attorneys at ONDA, replied to Seltzer's email within half an hour: "We understand our ethical responsibilities. [Langford] has been walled from the case and does not have access to any confidential

---

[2]The record does not reflect whether this deposition ever took place.

3

information. We will not withdraw from the matter. Please send [Mother]'s supplemental discovery today."

Mother then filed a Motion to Disqualify ONDA in the trial court. In addition to disqualification, Mother requested that Father be ordered to pay "reasonable attorney's fees, expenses, and costs" directly to Seltzer. The trial court initially scheduled the hearing on the Motion to Disqualify for August 29, 2024, but after ONDA objected to the setting due to a lack of proper notice and Father's attorney's availability, the trial court reset the hearing to September 11, 2024.

At the hearing on Mother's Motion to Disqualify, Langford testified that she had never talked to Mother. She denied ever having an email exchange with Mother or meeting her on May 10, 2024, when Mother first came to Seltzer Family Law's office. Langford was attending career day at her daughter's school on that date.

Langford further testified that she did not learn anything "relevant to the case" during the entirety of her time at Seltzer Family Law. She testified that she had never actively worked on Mother's case while employed with Seltzer Family Law, nor had she billed a single entry of time working on that case or had any discussions with attorneys regarding duties that they wanted her to perform on that case. According to Langford, Seltzer attempted to provide her information on Mother's case during the resignation meeting. Langford testified that, prior to that meeting, Seltzer had not discussed the case with her at all. She further testified that she had not discussed anything Seltzer had told her during that meeting with anyone in ONDA.

4

Screenshots of Langford's June 19 text message exchange with Padron were admitted into evidence. Langford testified that, after she came to ONDA, she was "[e]xplicitly" instructed to not discuss the case and to not work on the case. She was electronically prohibited from accessing the case file and physically prohibited from accessing the locked file in the office of Paula Bennett, the attorney in charge of Father's case. Additionally, Langford testified that she had been escorted out of docket meetings "[e]very time" the case had come up on Bennett's docket and that no one at ONDA had ever discussed the case with her or had asked her questions regarding what had gone on with the case.

On cross-examination, Langford recalled that she had arrived at the Seltzer Family Law office on May 10, 2024, after her daughter's career day, but she denied that Zachariah had talked to her and the other two paralegals at the firm about Mother's case. She acknowledged that conversations about client cases within the office were often informal and that there were often casual conversations in the hallway about cases. She also testified that it was very common for the paralegals and attorneys to work in each other's offices and that she herself had done so for the purpose of discussing legal matters, comparing notes, and offering suggestions. She admitted that she had open access to Mother's case file while she worked at the Seltzer Family Law office.

5

Screenshots of Langford's text message conversations with other employees of Seltzer Family Law were admitted into evidence.[3] On July 12, 2024, after she had left Seltzer Family Law and had begun working for ONDA, Langford texted Zachariah and two other Seltzer Family Law employees—Riley Kelton and Paige Pritchard—to ask if they were still coming to her daughter's birthday party that Sunday. After Kelton and Zachariah confirmed that they were, Langford said that she had told Downing to "be nice" to Kelton and Zachariah and that "[h]er response was funny b[e]c[ause] she immediately and very brightly told me she really likes" Zachariah. Zachariah responded, "Not Sarah haha," and Langford texted back, "I did not include her in my request for kindness lol." Langford testified at the hearing that, "prior to leaving, [Zachariah] had asked [her] to tell [Downing] to be nice to her."

Langford testified that she was not privy to conversations about this case at ONDA and that she had not personally had any communications or conversations on the case since her employment began at ONDA. But she admitted that she had found it "fun" that the attorneys from Seltzer Family Law would be coming to

<hr>

[3]The record contains extensive evidence of Langford's communications prior to her resignation from Seltzer Family Law. Because some of the evidence supports the trial court's finding that Langford obtained confidential information while employed at Seltzer Family Law, and because we may not make factual determinations in mandamus proceedings, *In re RSR Corp.*, 475 S.W.3d 775, 778 (Tex. 2015), we need not detail the content of Langford's pre-resignation communications. Instead, as our analysis will show, this case turns on whether the record evidence supports a finding either that Langford had shared confidential client information with ONDA or that there was a genuine threat that she had.

6

ONDA for Father's deposition and that she had joked with one of the Seltzer Family Law paralegals about sneaking away and meeting her in the bathroom to hug her.

Langford further admitted that she did have access to information about this case "[a]s it related to [her] schedule." For example, Langford said that Downing had informed her that the hearing on Mother's Motion to Disqualify might not take place on August 29, 2024, as originally scheduled. Langford assumed that "it was because . . . [t]here was an issue with" the Notice of Court Proceeding (NOCP). She acknowledged sending a text message to an unidentified paralegal in which Langford stated, "The NOCP wasn't filed correctly. It's not on the docket[.] I just want to be done." The paralegal responded, "So I guess no hearing," and, "Like huh." Langford then texted the paralegal, "I don't know that they have found out." She testified at the hearing that by this she had meant that she was not sure that Seltzer Family Law "had realized that the notice was incorrectly filed or whatever the situation was." Langford believed there had been an error made regarding setting the hearing.[4]

In the same text message conversation, the paralegal expressed confusion, and Langford told her that she did not "think it was RK since she was told not to touch it." The paralegal asked her, "Wait huh? RK told not to touch it?" Langford

---

[4]Langford maintained, "There was no confidential information as far as I'm aware other than whether or not I needed to show [up for the hearing]." When asked, "And so it's your testimony that you did not have any conversations other than just discussing scheduling with this other paralegal; is that correct?" Langford answered, "Yeah."

responded, "Yeah I guess Riley was taken off of it from what I understand." At the hearing, Langford explained that she had "had multiple members of Seltzer Family Law reach out and express regret, concern, and discomfort over the disqualification matter" and that "[i]t had been communicated that nobody wanted anything to do with it." Langford had gotten the impression that Kelton was no longer working on Mother's case.

On redirect examination, Langford made clear that no confidential information was shared in any of the foregoing text message conversations. Regarding the texts about the NOCP, she explained that Seltzer Family Law had served her with a subpoena the night before the originally scheduled hearing and that ONDA needed to take her scheduling along with her other responsibilities for the firm into consideration when telling her whether she needed to appear in court. She testified that she had never discussed any confidential information related to the case with anyone at ONDA and that she did not have access to any confidential information in the firm. She also testified that Seltzer Family Law had not disclosed any confidential information to her after she had left employment there.

Zachariah was the only other witness to testify at the hearing. She testified that she had discussed confidential information regarding Mother's case with Langford, as well as Kelton and Pritchard, the day that Mother had hired their firm.

Zachariah recalled the deposition coming up in conversation at Langford's residence after she had left Seltzer Family Law. She testified that Langford "had

8

indicated that it would be fun if . . . she got to participate in the deposition. Or that she indicated . . . we can sneak out and go say hi to each other in the bathroom." Zachariah testified that it concerned her that Langford "thought it was okay that she would participate in a deposition on a case that she should be nowhere near." However, Zachariah did not recall "anything else regarding the . . . case that was discussed at that time," and on cross-examination, she conceded that she did not disclose any additional confidential information about the case during the conversation. Although she testified that she had "reason to believe that conversations ha[d] continued between . . . Langford and . . . Pritchard," she did not explain why.[5] Similarly, Zachariah testified that she believed that Langford worked on this matter within the Seltzer Family Law office but did not elaborate.

Seltzer and ONDA each requested $5,000 in attorney's fees. The trial court made oral findings but did not rule on the Motion to Disqualify at the hearing. On September 17, 2024, the trial court entered an order disqualifying and removing ONDA as Father's attorneys of record in this matter. In the order, the trial court also assessed sanctions against ONDA "in the form of attorney's fees" and ordered ONDA to pay Seltzer Family Law $5,000 on or before October 1, 2024. On

---

[5]When asked what led her to believe that Langford and Pritchard were still discussing the case, Zachariah began to testify to something that Pritchard had told her. Father's attorney objected to hearsay, and the trial court sustained his objection. Seltzer, who was representing Mother at the hearing, then moved on to a different line of questioning.

September 27, 2024, Father petitioned this court for mandamus relief from the trial court's order and also moved to stay "all proceedings in the [t]rial [c]ourt," which this court did.

## II. ANALYSIS

In two issues, Father argues that the trial court abused its discretion by (1) disqualifying his attorneys and (2) ordering them to pay attorney's fees as sanctions. Mother counters that the trial court did not abuse its discretion. She also "urges this [c]ourt to lift the stay on the [t]rial [c]ourt and allow the [t]rial [c]ourt to set a hearing for temporary orders on October 8, 2024," and to "issue a just sanction against Father and ONDA in the form of reasonable and necessary attorney's fees associated with responding to this mandamus proceeding." *See* Tex. R. App. P. 52.11 (allowing a court to "impose just sanctions on a party or attorney who is not acting in good faith").

### A. STANDARD OF REVIEW

Mandamus relief is an extraordinary remedy. *In re Acad., Ltd.*, 625 S.W.3d 19, 25 (Tex. 2021) (orig. proceeding). The party seeking mandamus relief must show both that the trial court clearly abused its discretion and that the party has no adequate remedy by appeal. *In re Allstate Indem. Co.*, 622 S.W.3d 870, 875 (Tex. 2021) (orig. proceeding).

A trial court abuses its discretion when a decision is arbitrary, unreasonable, and without reference to guiding principles. *Id.*; *see Walker v. Packer*, 827 S.W.2d 833,

10

839–40 (Tex. 1992) (orig. proceeding). In determining whether a trial court abused its discretion, we defer to a trial court's factual determinations that have evidentiary support, but we review the trial court's legal determinations de novo. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding). An error of law or an erroneous application of the law to the facts is always an abuse of discretion. *See In re Geomet Recycling LLC*, 578 S.W.3d 82, 91–92 (Tex. 2019) (orig. proceeding).

An appellate remedy's adequacy has no specific definition; "the term is 'a proxy for the careful balance of jurisprudential considerations' [that implicate both public and private interests,] and its meaning 'depends heavily on the circumstances presented.'" *Allstate Indem. Co.*, 622 S.W.3d at 883 (quoting *In re Prudential Ins. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004) (orig. proceeding)); *In re Ford Motor Co.*, 165 S.W.3d 315, 317 (Tex. 2005) (orig. proceeding) (quoting *Prudential*, 148 S.W.3d at 136); *see also In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 464 (Tex. 2008) (orig. proceeding) ("Whether a clear abuse of discretion can be adequately remedied by appeal depends on a careful analysis of costs and benefits of interlocutory review.").

### B. APPLICABLE LAW

Disqualification of counsel is a severe remedy that can result in significant expense to clients—including the financial burden of obtaining substitute counsel who is not already familiar with the case—as well as disruption of the orderly progress of litigation and deprivation of a party's counsel of its choice. *In re Murrin Bros. 1885, Ltd.*, 603 S.W.3d 53, 57 (Tex. 2019) (orig. proceeding). Deciding whether to disqualify

counsel based on a nonlawyer employee's conduct involves a two-step process, and different presumptions apply at each step. *In re Turner*, 542 S.W.3d 553, 555–56 (Tex. 2017). First, a nonlawyer who worked on a matter at a prior firm is subject to a conclusive, irrebuttable presumption that she obtained confidential information on the matter. *In re Guar. Ins. Servs.*, 343 S.W.3d 130, 132 (Tex. 2011) (orig. proceeding). The second presumption—that the employee has shared the client's confidences with members of the second firm—may be rebutted, but only by a showing that the firm (1) instructed the paralegal "not to work on any matter on which the paralegal worked during the prior employment, or regarding which the paralegal has information relating to the former employer's representation" and (2) took "other reasonable steps to ensure that the paralegal does not work in connection with matters on which the paralegal worked during the prior employment, absent client consent." *In re Am. Home Products Corp.*, 985 S.W.2d 68, 75 (Tex. 1998) (orig. proceeding) (quoting *Phoenix Founders, Inc. v. Marshall,* 887 S.W.2d 831, 835 (Tex. 1994) (orig. proceeding)). "These other reasonable steps must include, at a minimum, formal, institutional measures to screen the employee from the case." *In re Columbia Valley Healthcare Sys., L.P.,* 320 S.W.3d 819, 828 (Tex.2010) (orig. proceeding).

## C. ANALYSIS

### 1. Disqualification

Regarding the first (irrebuttable) presumption, Zachariah testified that she had discussed confidential information regarding Mother's case with Langford the day that

12

Mother had hired their firm. Mother thus did not need to rely on the presumption that Langford obtained confidential information because evidence supports the trial court's conclusion that she did.

Moving to the second (rebuttable) presumption, that Langford had shared Mother's confidential information with ONDA, we hold that Father rebutted it by showing that ONDA had instructed Langford not to work on this case and had taken other reasonable steps to ensure that she did not work in connection with it. Langford testified that, after she came to ONDA, she was instructed specifically to not discuss or work on Father's case. Through Langford's testimony, ONDA established that it had electronically and physically prohibited her from accessing Father's case file, escorted her out of docket meetings when the case came up, and refrained from discussing the case with her or asking her about it. Langford also testified that she had never relayed any confidential information related to the case to anyone at ONDA, nor did she have access to any confidential information in the firm. Even the trial judge remarked at the hearing that she believed ONDA had taken "every precaution in attempting to seclude that case from" Langford, adding, "I don't think there's any question that you did all the things you're supposed to do."

Mother asserts that ONDA's compliance with the ethical provisions cited above nevertheless does not shield it from disqualification but "[e]ven if the [t]rial [c]ourt found that ONDA had taken the proper steps to screen . . . Langford," those steps were "ineffective in this case" to guard against a genuine threat of disclosure.

13

Mother points to the evidence that "Langford had deleted several files from her work computer on June 18, 2024, the day before her resignation and the day she volunteered to assist on discovery on this matter, and after she had accepted employment with ONDA." Mother does not explain how the trial court could have inferred from this evidence that the screening measures implemented by ONDA were ineffective or that Langford had disclosed confidential information to ONDA.

Mother also directs our attention to Langford's conversation about the NOCP and her comments about Father's deposition. Both of these communications occurred after Langford had left Seltzer Family Law, but neither evinces that she worked on Father's case at ONDA, much less that she shared confidential information with anyone there. Instead, these communications show that she knew about the scheduling of a hearing (in which she was expected to participate) and that she discussed it with employees of Seltzer Family Law.

Langford testified that she had access to information about this case as it related to her schedule. Regarding the NOCP, Mother herself necessitated Langford's presence at the hearing—the proceeding that the NOCP notified the parties about—by subpoenaing her.[6] As for Father's deposition, Mother contends that based on

---

[6]While a writ of mandamus is a legal remedy, its issuance is largely controlled by equitable principles. *In re Am. Airlines, Inc.*, 634 S.W.3d 38, 42 (Tex. 2021) (orig. proceeding); *In re Dawson*, 550 S.W.3d 625, 631 (Tex. 2018) (orig. proceeding) (citing *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 676 (Tex. 2009) (orig. proceeding)). It would be inequitable to uphold a disqualification on these facts. ONDA had

14

Langford's awareness that the deposition[7] had been noticed, discussion of her interest in participating in the depositions if she could, and statements that made clear that she knew where the depositions would take place, the trial court "was within its discretion to . . . conclude that . . . Langford was receiving this information from ONDA." But Mother's burden at the hearing was not to prove that Langford had received confidential information from ONDA. Rather, "[t]he test for disqualification is met by demonstrating a genuine *threat* of disclosure." *Grant v. Thirteenth Court of Appeals*, 888 S.W.2d 466, 467 (Tex. 1994) (orig. proceeding). Mother did not demonstrate that here.

Even if the trial court could have reasonably found that Langford's knowledge of the timing and location of Father's deposition evinced that ONDA's screening

---

effectively screened Langford from Father's case; it was Mother and Seltzer Family Law who then pulled her into it.

[7]In her Response, Mother references both hers and Father's depositions:

> Zachariah specifically testified that . . . Langford discussed participating in a deposition on this matter on June 29, 2024. At that time, the deposition was noticed to be scheduled at [Seltzer Family Law], but . . . Zachariah had discussed with ONDA the potential of amending the notice to have the deposition occur at ONDA if they would consent to taking Mother's deposition at [Seltzer Family Law]. It is notable that the deposition of Mother had not yet been noticed, and neither had the agreement that Father's deposition would occur at ONDA's office in Dallas.

Other than the discussion in which Langford expressed her interest in participating in a deposition, Zachariah did not testify to these facts. It appears that the only deposition referenced at the hearing was Father's.

15

measures were ineffective, the supreme court has cautioned that it has "never said that ineffective screening measures merited automatic disqualification for nonlawyers." *Guar. Ins.*, 343 S.W.3d at 134. In most cases, disqualification is not required provided that "the practical effect of formal screening has been achieved." *Id.* (quoting *Phoenix Founders,* 887 S.W.2d at 835). In other words, the "ultimate question" is whether ONDA "has taken measures sufficient to *reduce* the potential for misuse of confidences to an *acceptable* level." *Id.* at 135 (quoting *Phoenix Founders,* 887 S.W.2d at 836).

Our sister court in Tyler provided an application of this standard in a case similar to this one. In *In re Reeder*, the relator was being sued for unpaid attorney's fees. 515 S.W.3d 344, 348 (Tex. App.—Tyler 2016, no pet., orig. proceeding). A legal assistant who was working for White P.C.—the real party in interest law firm—at the time it filed the suit had previously worked as a legal assistant for Mayo Mendolia & Vice, L.L.P., the law firm that the relator retained to represent him. *Id.* After the relator retained Mayo, it rehired the legal assistant. *Id.* Mayo disclosed all cases in which it was involved in any capacity with White's office to the legal assistant and instructed her and all other firm personnel that she was not to (1) "field" any calls associated with the disclosed case files; (2) access those files through the firm server or by viewing the "hard files"; or (3) discuss those files, even in casual conversation, with any firm employee or partner until further notice from Mayo. *Id.* at 353. Mayo assigned all the disclosed case files to another legal assistant in the office and placed

16

all the hard files in another office that was segregated from the rehired legal assistant's office. *Id.* White nevertheless filed a motion to disqualify, which the trial court granted. *Id.* at 348.

The relator petitioned for mandamus relief, and the court of appeals held that the trial court had abused its discretion in granting White's motion to disqualify. *Id.* at 355. The court of appeals reasoned that the uncontroverted evidence conclusively showed that Mayo had implemented screening measures that "render[ed] the possibility of [the legal assistant's] having contact with [the relator's] file less likely" and that, consequently, the measures were "sufficient to reduce the potential for misuse of confidences to an acceptable level." *Id.* at 353 (first quoting *Columbia Valley,* 320 S.W.3d at 826, and then quoting *Guar. Ins.,* 343 S.W.3d at 135). Thus, the relator had rebutted the presumption of shared confidences, and the trial court could not reasonably have concluded that Mayo should have been disqualified based on the dual representation.

We must reach a similar decision in the present case. The evidence that ONDA had instructed Langford not to work on this case and had taken other reasonable measures—which were even more stringent and thorough than the measures implemented in *Reeder*—to ensure that she did not work on the case was uncontroverted, as was her testimony that she had never relayed any confidential information related to the case to anyone at ONDA. The fact that she knew ahead of time that attorneys from Seltzer Family Law would be coming to ONDA for Father's

17

deposition does not mean that the screening measures that ONDA had taken were insufficient "to reduce the potential for misuse of confidences to an acceptable level," *see Guar. Ins.*, 343 S.W.3d at 135, especially when the record does not reflect how she learned those details or that she actually participated in the deposition. While Langford's continuing to communicate about the case with her former colleagues at Seltzer Family Law may have been unwise,[8] Mother did not show that Langford had disclosed confidential client information to ONDA or that Langford's conduct demonstrated a genuine threat of disclosure. We therefore hold that Father rebutted the presumption of shared confidences and that the trial court abused its discretion by granting Mother's Motion to Disqualify and disqualifying ONDA.

We further hold that Father has no adequate remedy by appeal. A party whose counsel is improperly disqualified has no adequate remedy by appeal. *See id.* at 132. We sustain Father's first issue.

## 2. Sanctions

Because the trial court erred in granting Mother's Motion to Disqualify, it also erred to award Seltzer Family Law attorney's fees as sanctions.[9] *See In*

[8]Langford's "casual conversation" about the case after she began working at ONDA creates one factual distinction between this case and *Reeder*. *See* 515 S.W.3d at 353. But she discussed the case with employees or former employees of Seltzer Family Law, not ONDA. There is no evidence in the record that she disclosed confidential client information to ONDA.

[9]Even if we overruled Father's first issue, we would still sustain his second. "[W]hen a party seeks attorney's fees as sanctions, the burden is on that party to put

*re Kalahari Resorts*, No. 03-24-00271-CV, 2024 WL 3187648, at *9 (Tex. App.—Austin June 26, 2024, orig. proceeding) (memorandum opinion). We sustain Father's second issue.

### III. CONCLUSION

Having sustained both of Father's issues, we grant Mother's request to lift the stay on the trial court in part and deny it in part. Our emergency stay of "[a]ll trial court proceedings . . . until further order of this court," issued September 27, 2024, is hereby lifted, but the trial court's "Order Disqualifying Orsinger, Nelson, Downing & Anderson, LLP" remains stayed until the trial court vacates it. We are confident the

forth some affirmative evidence of attorney's fees incurred and how those fees resulted from or were caused by the sanctionable conduct." *CHRISTUS Health Gulf Coast v. Carswell*, 505 S.W.3d 528, 540 (Tex. 2016). Mother did not do that here.

Mother contends in her Response that the trial court was within its discretion to award sanctions in the form of attorney's fees in this case. She points to ONDA's own request for attorney's fees and this statement by one of its attorneys who represented Father at the hearing: "I think $5,000.00 would be reasonable in this case for the time spent in it as well." Mother claims that the attorney who made this statement "conceded that $5,000.00 is reasonable under the facts of this case and the time spent" and that "Father has waived the right to argue the reasonableness of the award of attorney's fees under these circumstances." Mother cites no authority for her waiver argument or her implicit argument that an attorney's conclusory statement is affirmative evidence of attorney's fees incurred and how those fees resulted from or were caused by the sanctionable conduct.

She also contends that the trial court "had the discretion to sanction ONDA for the frivolous statements made in [its response to Mother's Motion to Disqualify] in the form of attorney's fees to Mother." Courts shall presume that pleadings, motions, and other papers are filed in good faith, Tex. R. Civ. P. 13, and Mother did not rebut that presumption.

trial court will forthwith issue a new order vacating the disqualification order and denying Mother's Motion to Disqualify. The writ of mandamus will issue only if the trial court fails to do so. Mother's request that we sanction Father is denied.

/s/ Brian Walker

Brian Walker
Justice

Delivered: December 5, 2024